## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FADI ELSALAMEEN**<br>2856 Arizona Avenue NW<br>Washington, DC 20016<br><br>Plaintiff,<br><br>v.<br><br>**BANK OF PALESTINE, P.L.C.**<br>Bank of Palestine Building<br>Nazlet Al Mahkamah Street<br>Ain Misbah<br>Ramallah, Palestinian Territory<br><br>Defendant. | Case No. 16-cv-1976<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

This lawsuit seeks redress for the unlawful actions of Defendant the Bank of Palestine, which it undertook in a prolonged, well-orchestrated effort to discredit and extort Plaintiff Fadi Elsalameen, due to his political affiliations and public statements made against the current Palestinian regime.   As part of its scheme, the Bank of Palestine defamed Mr. Elsalameen, conspired with Palestinian government officials to defame him, invaded his privacy, cast him in a false light, and interfered tortiously with contracts and business opportunities.  The Bank of Palestine's actions had the direct and intended result of damaging Mr. Elsalameen's reputation and standing in the business community and scuttling valuable business opportunities.  The Bank of Palestine's actions have resulted in death threats against Mr. Elsalameen and have prevented him from returning to Palestine.  In support of his claims against the Bank of Palestine, Mr. Elsalameen alleges as follows:

1

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Mr. Elsalameen is a citizen of the United States and the District of Columbia, the Bank of Palestine is a citizen of the Palestinian Territories, the Bank of Palestine is not domiciled in the District of Columbia, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Elsalameen's claims occurred in the District of Columbia.  Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because the Bank of Palestine is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

3.      Mr. Elsalameen is a resident and citizen of the United States and the District of Columbia.  Mr. Elsalameen is also an Israeli citizen of Arab descent.  At all relevant times, Mr. Elsalameen resided in the District of Columbia and the harm he suffered to his reputation and business interests occurred here.

4.      Mr. Elsalameen was born in Beersheba, Israel and raised in Hebron in the West Bank.  He attended school in the United States, earning a Master's in International Relations and Economics from Johns Hopkins University School of Advanced International Studies.

5.      Mr. Elsalameen supports the legitimate government institutions of Palestine, although he is a frequent critic of corrupt and opaque practices among individuals within Palestinian government bodies and the current administration.  Mr. Elsalameen has been an outspoken critic of the current President of the Palestinian National Authority, Mahmoud Abbas.

6.     Bank of Palestine is one of the largest national banks operating in Palestine.  It is a public shareholding company organized under the laws of the Palestinian National Authority. Its principal place of business is in Ramallah.  The Bank of Palestine maintains one or more correspondent accounts in the United States with Citigroup, Inc. and maintains a registered agent in New York for purposes of accepting service of process from the Secretary of the Treasury or the Attorney General of the United States pursuant to 31 U.S.C. § 5318(k).

7.     Bank of Palestine has significant contacts with the District of Columbia.  For example, Bank of Palestine receives guarantees covering payment risk for trade-related transactions, permitting it to issue letters of credit for export-import transactions through the International Finance Corporation's Global Trade Finance Program.  The International Finance Corporation is an arm of the World Bank, located at 2121 Pennsylvania Avenue NW, Washington, DC 20433.

8.     Bank of Palestine has received tens of millions of dollars in original commitments from the District of Columbia-based International Finance Corporation.

9.     Bank of Palestine's further cooperation with the International Finance Corporation resulted in an equity investment of up to 10 percent, a student loan facility supported by the Palestinian Education Fund, and a housing finance initiative to provide affordable housing.

10.    Bank of Palestine's affordable housing initiative is a $500 million program that provides loans to low- and middle-income Palestinian households.  Of the $500 million, Bank of Palestine received $325 million from the Overseas Private Investment Corporation, a U.S. Government development finance institution located at 1100 New York Avenue, NW, Washington, DC 20527.  The International Finance Corporation provided $75 million in loan

guarantees for the affordable housing initiative.

11.     Bank of Palestine is a member of the Institute of International Finance, a think

tank that actively advocates for regulatory, financial, and economic policies that are in the

interests of its members.  The Institute of International Finance is headquartered at 1333 H Street

NW, Suite 800E, Washington, DC 20005.

### RELEVANT NON-PARTIES

12.     The Palestinian Monetary Authority is the foreign banking authority that licenses

and regulates the Bank of Palestine's banking activities.

13.     The Palestinian Security Service is an organization comprised of multiple

divisions, including a Preventative Security Force and the Mukhabarat, which are nominally

responsible for internal intelligence activities and the monitoring of opposition groups within the

Palestinian Territories (collectively, "Palestinian Intelligence").

14.     Al Serena International Trade and Investment Company ("Al Serena") is a

Palestinian limited liability company, which was registered under registration number

562527804 on September 26, 2013.

15.     Muawiah Al Qawasmi ("Al Qawasmi") is the Bank of Palestine Area Manager of

Southern West Bank.

16.     Al Akhbar is an online news publication.  On information and belief, Al Akhbar is

a known news outlet for the terrorist organization Hezbollah.  Hezbollah owns and funds Al

Akhbar.

17.     Hashim Shawa is the Chairman of the Bank of Palestine.

18.     Mohammad Mustafa is the Chairman of the Palestinian Investment Fund and

former Deputy Prime Minister for Economic Affairs of the Palestinian National Authority.

19.     Shukri Bishara is the current Palestinian Minister of Finance.

## FACTUAL ALLEGATIONS

*Mr. Elsalameen's Outspoken Criticism of the Palestinian National Authority*

20.     Since approximately 2011, Mr. Elsalameen has been an outspoken critic of the Palestinian National Authority and its president, Mahmoud Abbas.  Mr. Elsalameen criticized, among other things, Abbas's corruption, that he had remained in office beyond his term limit, and that he had failed to call national elections.

21.     For example, Mr. Elsalameen has published articles critical of the Palestinian National Authority through Al Jazeera, the Huffington Post, and the Maan News Agency.  His criticisms have been featured in multiple other news outlets, including the Times of Israel, the Economist, and Haaretz.  He has given critical interviews on CNN and CCTV America.  And Mr. Elsalameen's social media accounts, through which he regularly criticizes the Palestinian National Authority and President Abbas, have more than 600,000 followers in Palestine and elsewhere.

22.     Mr. Elsalameen's well-published and outspoken criticisms of the Palestinian National Authority and President Abbas earned him notoriety and respect throughout Palestine and the Middle East.

23.     In that capacity, Mr. Elsalameen became a well-known opponent of President Abbas, and a central figure in the opposition to the Abbas-controlled Palestinian National Authority.

*Bank of Palestine Has Close and Corrupt Ties to the Palestinian National Authority and Palestinian Intelligence*

24.     Bank of Palestine has close ties to the Palestinian National Authority and the Palestinian Intelligence.  The Bank of Palestine is the largest lender to the Palestinian National

Authority.  The son of Palestinian President Abbas is a close personal friend of Bank of Palestine

Chairman Hashim Shawa.  Hashim Shawa is a close personal friend of Shukri Bishara, the

Minister of Finance. And Azzam Shawwa, Governor of the Palestinian Monetary Authority is a

cousin of Mohammad Mustafa, Chairman of the Palestinian Investment Fund.

25.    Bank of Palestine and Palestinian government agencies regularly enter into joint

business relationships.  Senior Palestinian government officials and senior Bank of Palestine

officials have conspired to fix stock prices.  A Bank of Palestine official has unlawfully accepted

kickbacks for Bank of Palestine contracts.  And the Palestinian Authority pays employees'

salaries using loans from the Bank of Palestine.

26.    And, as set forth herein, the Bank of Palestine and Palestinian Intelligence

officials conspired to defame Mr. Elsalameen, cast him in a false light, invade his privacy, and

tortuously interfere with contracts and business relationships—Palestinian Intelligence motivated

by its desire either to silence or discredit an outspoken critic, and the Bank of Palestine

motivated by Mr. Elsalameen's refusal to engage in the corrupt practices Bank of Palestine

officials use to line their pockets.

*Elsalameen Forms Al Serena to Broker Purchase of Jerusalem Property and Opens Account at*
*Bank of Palestine*

27.    In September 2013, Mr. Elsalameen and his aunt, Mariam Salameen, established

Al Serena.  Al Serena's registered place of business is located in the West Bank city of Hebron.

Although located in Hebron, Al Serena primarily conducted business through Mr. Elsalameen

from the District of Columbia.

28.    Al Serena's purpose was to act as an agent for a United Arab Emirates entity, Al-

Thuraya Consultancies and Research Company ("Al-Thuraya") to effect the purchase of a parcel

of real property and its improvements in Jerusalem identified in Register 1015, page 3035, of the

Old Town Land Records of Jerusalem (the "<u>Jerusalem Property</u>").

29.     Although Al-Thuraya agreed to cover Al Serena and Mr. Elsalameen's expenses in effecting the property transfer, Al-Thuraya was not otherwise providing monetary compensation to Al Serena or Mr. Elsalameen.  Rather, by acting as Al-Thuraya's agent in the property transfer, Al Serena and Mr. Elsalameen stood to gain significant goodwill within the UAE business community, and they anticipated that the goodwill would help to secure additional lucrative business relationships.

30.     Upon formation of Al Serena, the company opened a Bank of Palestine account with the Bank of Palestine and funded the account with $2 million transferred from Al-Thuraya.

31.     Mr. Elsalameen had numerous conversations with Bank of Palestine officials regarding the purpose of the account and the reasons for placing the funds within.

32.     In furtherance of the property acquisition, on November 5, 2014, Mr. Elsalameen entered into a preliminary property sales agreement with Lamiaa Gouda, an heir to the title of the Jerusalem Property, and her son and attorney-in-fact, Adeeb Jawad Gouda.

33.     The purchase price for the property was $2.5 million, payable in tranches.  The first tranche of $1,520,000 was due upon signing the agreement.

34.     Mr. Elsalameen caused Al Serena to pay the first tranche, of which $1 million was transferred from Al Serena's account with the Bank of Palestine.

35.     The second tranche of $980,000 was due once Ms. Gouda was able to obtain clear title to the property from other heirs and record in Israel's land registry that title to the property was marketable.

<u>*The Conspiracy Between the Bank of Palestine and Palestinian Intelligence*</u>

36.     As discussed below, in or around early 2015, Bank of Palestine and Palestinian

Intelligence entered into an agreement to advance their mutually beneficial and unlawful goals. Knowing that Mr. Elsalameen's company now had an account with the Bank of Palestine, the Bank of Palestine would induce Mr. Elsalameen to pay a bribe for its own gain and thereby tarnish his reputation as a respected and outspoken critic of the current Palestinian government's corrupt and unlawful practices.   When Mr. Elsalameen refused the Bank of Palestine's entreaty to engage in corrupt practices, the Bank of Palestine and Palestinian Intelligence changed tactics, conspiring to defame him and invade his privacy in retaliation through the Hezbollah-owned and operated Al Akhbar news outlet.   The harm Mr. Elsalameen has experienced from these invasions and wrongful acts has been profound, totaling hundreds of millions of dollars.

### *Bank of Palestine Demands Bribes to Access Account*

37.     The conspirators first acted in or around April 2015, while Mr. Elsalameen awaited marketable title to the Jerusalem Property.   In order to protect the property while awaiting title, Mr. Elsalameen employed security guards around the property.   To pay the security guards, Mr. Elsalameen sent a request to the Bank of Palestine from the District of Columbia on April 16, 2015, requesting that the Bank of Palestine disburse $9,000.00 to Mr. Elsalameen's brother.

38.     When Mr. Elsalameen's brother went to the Hebron branch of the Bank of Palestine to collect the $9,000.00, the Bank of Palestine Area Manager of Southern West Bank, Al Qawasmi, informed him that the account had been frozen.

39.     Mr. Elsalameen's brother demanded documentation or confirmation that the account was lawfully frozen, which Al Qawasmi refused to provide.   At a meeting at Al Qawasmi's home, he informed Mr. Elsalameen's brother that Mr. Elsalameen was "in trouble" with Palestinian authorities and falsely intimated that the Bank of Palestine was under political

pressure from the Palestinian Authority to freeze the account.

40.     In May 2015, in an effort to understand and correct the Bank of Palestine's unlawful freeze of Al Serena's account, Mr. Elsalameen flew to Kuwait from Washington, D.C. to meet personally with Al Qawasmi.  At the meeting, Al Qawasmi reiterated to Mr. Elsalameen that Al Serena's account was frozen but nonetheless assured him that he would be able to access the funds.  Al Qawasmi told Mr. Elsalameen that Al Qawasmi would open a new company account, Mr. Elsalameen would need to transfer the funds from Al Serena's account to the new account, and Al Qawasmi would give Mr. Elsalameen the funds in cash or check.

41.     Finding this option suspect and unacceptable, Mr. Elsalameen continued, from the District of Columbia, to communicate with Al Qawasmi directly and through a trusted friend, Nabil Al Jabari.  Al Qawasmi made his corrupt purpose even more specific, explicitly informing Mr. Al Jabari that Bank of Palestine would unfreeze Al Serena's account, but only in exchange for payment of a $500,000 bribe.

*Bank of Palestine Continues Unlawfully to Refuse Access to Al Serena Funds*

42.     On December 14, 2015, the property records for the Jerusalem Property were updated in the Israeli land registry, showing that title to the property was clear and vested in a single individual.

43.     On January 24, 2016, Mr. Elsalameen caused an irrevocable power of attorney to be recorded with the Israeli land registry.  This document provided notice of the sales transaction and that title would vest in Mr. Elsalameen upon completion of the sales transaction, *i.e.*, once Mr. Elsalameen caused Al Serena to pay the final tranche of $980,000.

44.     On the suggestion of acquaintances in the UAE, Mr. Elsalameen attempted to work with a different Bank of Palestine official, Omnia Faisal AbuShahla, the Diaspora Officer

in Gaza.

45.     Accordingly, on March 15, 2016, Mr. Elsalameen requested that Ms. AbuShahla

transfer the sum of $980,000 to an account for the seller.  Bank of Palestine, however, refused to

effect the funds transfer, insisting that the account was frozen, not due to the unlawful conspiracy

to injure Mr. Elsalameen, but because the Bank of Palestine required documentation regarding

the death of Mr. Elsalameen's aunt and current authority over the account.  As described below,

this was, however, a ruse designed to induce Mr. Elsalameen to share extensive, personal

documentation with the Bank of Palestine.

### *Bank of Palestine Colludes with Palestinian Intelligence*
### *To Gather Confidential Information Regarding Mr. Elsalameen*

46.     On March 18, 2016, Mr. Elsalameen wrote to the head of Bank of Palestine's

Diaspora Unit, Salim Hodali.  Mr. Elsalameen informed Hodali that he had learned that a Bank

of Palestine official had informed Palestinian Intelligence about the Al Serena account and that

Palestinian Intelligence officials had interrogated the son of the owner of the Jerusalem Property.

Mr. Elsalameen reminded Hodali, "I have nothing to hide.  Everything I do is above the table.  I

might criticize Abbas but I am not part of any illegal activities against him or anyone else.  My

record is clean and criticism of anyone is not a crime."

47.     Bank of Palestine, essentially acting as an arm of the Palestinian Intelligence,

mislead Mr. Elsalameen regarding the status of the account in order to induce Mr. Elsalameen to

send Bank of Palestine multiple documents showing his personally identifiable information.

Specifically, on March 20, 2016, Bank of Palestine's Diaspora Unit informed Mr. Elsalameen

that the *only* issue with transferring funds from the Al Serena account was determining who had

signature authority over the account following the death of Mr. Elsalameen's aunt on May 7,

2015.  The Bank of Palestine specifically requested that Mr. Elsalameen provide it with his

personally identifiable information in order to correct this "issue."

48.     In reality, this "issue" was a ruse, manufactured by the Bank of Palestine to obtain

Mr. Elsalameen's personal identifiable information.  Indeed, in its efforts to extort Mr.

Elsalameen, the Bank of Palestine had previously informed him that his account had been

"frozen" in April 2015, *before* the death of his aunt.

49.     The Bank of Palestine's representations were false both because it did not require

Mr. Elsalameen's personally identifiable information to transfer his funds as requested, and

because the Bank of Palestine never intended to use that information for official Bank of

Palestine business.  Rather, in obtaining Mr. Elsalameen's documentation, the Bank of Palestine

intended to wrongly transfer those documents to Palestinian Intelligence.

50.     Relying on the Bank of Palestine's representations, Mr. Elsalameen, through his

Palestinian counsel, cooperated fully with the Bank of Palestine and with the Palestinian

Companies Controller within the Ministry of National Economy.  Mr. Elsalameen sought to

establish:  (a) his authority over the Al Serena account and (b) the lawful purpose of the transfer.

51.     To that end, Mr. Elsalameen sent Bank of Palestine officials a copy of the

property sales agreements (one between Mr. Elsalameen and the owners of the Jerusalem

Property, one between Al Serena and Al-Thuraya) and photographs Mr. Elsalameen had taken of

his United States passport, Israeli passport, and Israeli identity card.  These photographs are

readily recognizable because they were taken with Mr. Elsalameen's iPhone.

*52.*     Without any legal justification and in furtherance of a conspiracy to defame and

otherwise injure Mr. Elsalameen, Bank of Palestine promptly transmitted these documents to its

co-conspirators in Palestinian Intelligence.

*Palestinian Intelligence Official Intimidates and Harasses Property Owner*

53.     Bank of Palestine and the Palestinian Intelligence Service had regular communications regarding Mr. Elsalameen and the purchase of the Jerusalem Property.  Upon learning from the Bank of Palestine that title to the Jerusalem Property was clear and that Mr. Elsalameen was attempting to complete the transaction, Palestinian Intelligence officers called upon the owner of the property's son and interrogated him.

54.     The intelligence officers informed the owner's son that they knew he was attempting to transfer the property to Mr. Elsalameen.  The intelligence officers falsely accused Mr. Elsalameen of collaborating with Israelis to sell the property to Israeli Jews, a crime considered to be treason and punishable by death under applicable Palestinian law.

55.     The intelligence officers knew this accusation was false from their collaboration with Bank of Palestine.  They knew, instead, that the property transaction was entirely lawful and for the benefit of a UAE entity.

56.     The intelligence officials demanded that the property owner's son meet with Palestinian President Abbas and sell the property to him, rather than to Mr. Elsalameen.

57.     When the property owner's son refused to bow to the intelligence officers' demands, they retaliated by causing his Bank of Palestine accounts to be frozen as well.

*Bank of Palestine and Palestinian Intelligence Officials Conspire to Defame Mr. Elsalameen*

58.     While attempting to provide the Bank of Palestine the documentation it demanded under the pretext of cooperating with Mr. Elsalameen, the Palestinian Companies Controller facilitated a telephone call between Mr. Elsalameen's counsel and a member of the Palestinian Intelligence regarding a security clearance to transfer shares of Al Serena through probate.

59.     Mr. Elsalameen, himself, promptly made contact with the Palestinian Intelligence

official.  The official informed Mr. Elsalameen, "I have a lot of respect for you.  This is a fight

from powers above me."  The official further informed Mr. Elsalameen that the property

transaction was, in fact, lawful; noted Mr. Elsalameen's criticism of Palestinian President Abbas;

and admitted that he was following orders from the highest levels of Palestinian Intelligence.

60.     On April 7, 2016, approximately one year after Mr. Elsalameen was first denied

access to his account, the Ramallah Court of First Instance issued a Provisional Seizure Order,

ordering that the Al Serena account be frozen.  The Court issued the provisional seizure order

because, on information and belief, Bank of Palestine and Palestinian Intelligence provided the

Palestinian Attorney General with false and defamatory information implying that Mr.

Elsalameen was an agent of the Israeli government who intended to transfer the Jerusalem

Property to Israeli Jewish settlers.  Had Bank of Palestine and Palestinian Intelligence officials

provided truthful, non-defamatory information to the Palestinian Attorney General, *i.e.*, that the

property transaction was a lawful transfer for the benefit of a UAE entity and that Mr.

Elsalameen was not an agent of the Israeli government, the Court would not have issued the

provisional seizure order.

61.     Palestinian Intelligence officials, armed with information and documentation Mr.

Elsalameen provided only to Bank of Palestine, approached the owner of the property and

attempted to induce him to publish a false and defamatory article regarding Mr. Elsalameen,

claiming that he was an Israeli agent who intended to transfer the Jerusalem Property to Israeli

Jews.  When the property owner refused, the conspirators resorted to publishing defamatory

articles themselves through other means.

62.     On information and belief, Bank of Palestine and agents of the Palestinian

government were reluctant to publish false and defamatory statements regarding Mr. Elsalameen

directly.  This is because they knew the property transfer was, in fact, a lawful property transaction for the benefit of a UAE entity.  The Palestinian government was wary of souring political relations with the government of the UAE.  Bank of Palestine, likewise, was wary of souring relations with the government of the UAE because, among other reasons, it was set to open its first overseas office in the Dubai International Financial Centre in May 2016.

63.     Accordingly, Bank of Palestine and Palestinian Intelligence officials caused false and defamatory articles to be published through Al Akhbar, an online news publication owned and controlled by Hezbollah.  This would permit both the Palestinian National Authority and Bank of Palestine to hide their complicity in the articles' publication.

64.     Bank of Palestine and Palestinian Intelligence officials published the first article through Al Akhbar on May 27, 2016.  The article contains numerous false and defamatory statements.  Those statements, read in context, either imply or explicitly state that Mr. Elsalameen was working as an agent of Israelis to sell the property to Israeli Jews, a crime considered to be treason and punishable by death under applicable Palestinian law.

   a.  For example, it claims that Mr. Elsalameen's goal in the property transaction "is to repeat an exodus of the magnitude of the Palestinian Exodus of 1948, specifically to chase [Palestinians] out of Jerusalem."

   b.  It accuses Mr. Elsalameen of attempting "to demographically transform the Occupied City into Israel's capital . . . with the hope that this will bring an end to one of the main outstanding issues in the path of settlement, or in other words sell the most important part of what is left of Palestine."

   c.  The article implies that Mr. Elsalameen sought to "buy up property from Jerusalemites, under the pretext [of] buying them from those who can no longer

live in the Old City . . . despite the fact that these properties are being sold to

Israeli associations . . . and thus the people of the neighborhood wake up to find

settlers among them claiming to now be legal owners."

d.   The article claims that Mr. Elsalameen's "employer usually uses him for issues

that are far more complex than the sale of Jerusalem's houses to Israel!"

e.   The article implies that Mr. Elsalameen's goal was the "judaization of the area

surrounding Al-Aqsa, and, secondly, a de facto judaization of the [Al-Aqsa]

Mosque."

f.   The article impliedly implicates Mr. Elsalameen in "the scandals of third-party

sales to settlers."

g.   The article states that "it is easy for [Elsalameen] to claim that he bought the

house in order to 'protect it' from falling into settlers' hands.  However, given

assignment of the house to a UAE company while the houses around the property

and in other neighborhoods are falling, one after the other, into Jewish hands,

given the large sum being paid in the deal, . . . given the means by which he

obtained Israeli citizenship, and given the legal facilities provided to him, which

would have been impossible to obtain if the work was 'national' . . . these factors

necessarily implicate him from beginning to end."

h.   The article questions how Mr. Elsalameen could have formed Al Serena "in light

of the fact that he has combatted and insulted [the Palestinian National

Authority's] President, Mahmoud Abbas, and disclosed documents showing [the

Palestinian National Authority's corruption]."

65.   The article contains detailed descriptions of the property sales contract between

Mr. Elsalameen and the property owners, on the one hand, and the contract between Al Serena and Al-Thuraya on the other.  The detailed information included not only the names of all parties, but detailed information regarding the tranches of payments.  The article also disclosed that Mr. Elsalameen had already provided the initial tranche of $1,520,000 for the property.

66.     Mr. Elsalameen had provided information pertaining to these contracts and transactions *only* to Bank of Palestine.  Bank of Palestine necessarily provided copies of the same documents and records to Palestinian Intelligence officials in furtherance of their conspiracy to defame and harm Mr. Elsalameen.  The Bank of Palestine's participation in the conspiracy was not limited to sharing documents and information pertaining to the property sale.  The article also references a $10,000 payment from Mr. Elsalameen to an attorney in Switzerland, something that would only be revealed through Bank of Palestine account statements.  Bank of Palestine opened its books to its co-conspirators in Palestinian Intelligence in order to portray Mr. Elsalameen as an Israeli agent intent on alienating Palestinian-held property to Israeli settlers.

67.     Bank of Palestine and Palestinian Intelligence authorities published a second article through Al Akhbar, also on May 27, 2016.  The article contains numerous false and defamatory statements and gross invasions of Mr. Elsalameen's privacy.

    i.   The article falsely accuses Mr. Elsalameen of having the protection of Shin Bet, Israel's internal security service.

    j.   The article implies that Mr. Elsalameen is an agent of Israel and unlawfully obtained Israeli citizenship.  Specifically, the article questions that Mr. Elsalameen was born in Hebron, asserting that anyone born in Hebron would only have been entitled to a green Palestinian identity card, rather than a blue Israeli

identity card.

k.  The article accuses Mr. Elsalameen of being a Vice President at a shipping

company involved in war crimes in Liberia and suggests that Mr. Elsalameen may

be involved in a maritime registration company that is "specifically able to

camouflage the registration of transport liners for weapons vessels in transactions

that are beyond legal coverage, including to the Middle East as an example."

l.  The article falsely accuses Mr. Elsalameen of treason for having assisted in the

transfer of property from Palestinian to Israeli Jewish hands, a capital offense.

m.  The article contains photographs of identity documents, which Mr. Elsalameen

had provided *only* to Bank of Palestine.

n.  One of the documents published in the article was Mr. Elsalameen's Israeli

identity card:



The image above is a direct screenshot from the article.  The version of the identity card published in the article contained no redactions and disclosed publicly Mr. Elsalameen's personally identifiable information.

o.  The article also published copies of Mr. Elsalameen's Israeli and Untied States passports that he had provided *only* to Bank of Palestine, again, without the redactions contained herein:





p.   The article published Mr. Elsalameen's home address in Washington, D.C.;

pictures of his home from the street; details of his mortgage and a line of credit;

and information regarding his political contributions in the United States.

68.   While the second article does not reveal Bank of Palestine's motivation for

defaming Mr. Elsalameen, *i.e.*, because he failed to pay the Bank of Palestine a $500,000 bribe to

release Al Serena's funds, it does reveal the Bank of Palestine's co-conspirators' motive.  The

article notes that Mr. Elsalameen is a "fat cat despite his slender build" who works with an

investment capital and private equity firm "headed by a Jew."  The article explains that "[e]ver

since the year 2011 at least, Elsalameen began criticizing Abbas, describing him as 'an

ineffective ambassador for Palestine at international organizations' such as the United Nations."

"He called on him numerous times to resign from his post."  "In 2011, in his capacity as a

member of the New America Foundation, he published a few articles on the Qatari Al Jazeera

site and the Israeli Haaretz page calling for both Abbas and Fayyad to resign after 'two decades

of failed policies.'"

69.   In sum, Bank of Palestine and Palestinian Intelligence officials colluded to

advance their mutually beneficial and unlawful goals.  Bank of Palestine would induce Mr.

Elsalameen to pay a bribe for its own gain and thereby tarnish his reputation as a respected and

outspoken critic of the current Palestinian government's corrupt and unlawful practices.  When

Mr. Elsalameen refused the Bank of Palestine's entreaty to engage in corrupt practices, the Bank

of Palestine and Palestinian Intelligence conspired to defame him and invade his privacy in

retaliation through the Hezbollah-owned and operated Al Akhbar news outlet.  The harm Mr.

Elsalameen has experienced from these invasions and wrongful acts has been profound.

*Bank of Palestine's Defamation, Conspiracy, and*
*Invasions of Privacy Have Caused Profound Harm*

70.     As a result of the Bank of Palestine's (and its co-conspirators') false and

defamatory statements, Mr. Elsalameen has experienced profound harm in the District of

Columbia.  He has received death threats.  His email and social media accounts have been

subject to hacking.  His career and reputation in Palestinian political circles has been profoundly

damaged.  He cannot return to his home in Palestine because he fears unlawful arrest, detention,

and execution.

71.     While minor compared to Mr. Elsalameen's *de facto* exile from the place of his

birth and threats to his life, the Bank of Palestine's conduct has also resulted in significant harm

to Mr. Elsalameen's business reputation, contractual relations, and business expectancies.

72.     As a result of the Bank of Palestine's defamatory statements in the Al Akhbar

articles, Mr. Elsalameen has been essentially black-listed in the Palestinian business community.

73.     The sale of the Jerusalem Property has never come to fruition because of the Bank

of Palestine's defamation and unlawful seizure of Al Serena's funds.  As a result, Mr.

Elsalameen has suffered damages in the amount of the sales price of the property, and his

business reputation in the Middle Eastern business community has also been greatly tarnished.

74.     In addition, before the Bank of Palestine and its co-conspirators began their

campaign of defamation, Mr. Elsalameen was in the process of brokering a $1 billion loan

between two sovereign governments, one in the Middle East, the other in Africa.  Mr.

Elsalameen stood to earn a 10% commission in exchange for brokering the loan, *i.e.*, $100

million. The Bank of Palestine was well aware of this lucrative business opportunity, as Mr.

Elsalameen had many conversations with Al Qawasmi regarding the deal and, before he refused

to pay the Bank of Palestine a $500,000 bribe, Al Qawasmi actively encouraged Mr. Elsalameen

to open a Bank of Palestine account to accept the commission payment.

## COUNT I
## Defamation *Per Se*

75.     Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth herein.

76.     Bank of Palestine made numerous false and defamatory statements regarding Mr. Elsalameen to Palestinian Intelligence, including that he was attempting to broker a property transaction that would result in transfer of the Jerusalem Property to Israeli settlers, that Mr. Elsalameen was an agent of Israel, that he was under the protection of Shin Bet, and that he was attempting to use Al Serena to engage in unlawful activities.  Bank of Palestine made these statements on or around April 7, 2016 to the Palestinian Attorney General.  Even if such statements were subject to a qualified privilege, Bank of Palestine made the statements with actual malice, *i.e.*, the Bank of Palestine knew the statements were false based on its longstanding relationship with Mr. Elsalameen.  The Bank of Palestine made the statements:  (a) to retaliate against Mr. Elsalameen for refusing to pay a bribe and (b) to further its conspiracy to defame Mr. Elsalameen with Palestinian Intelligence by obtaining an ostensibly lawful order to freeze Al Serena's account.

77.     Bank of Palestine made additional false and defamatory statements, without privilege, regarding Mr. Elsalameen through Al Akhbar on or about May 27, 2016, as set forth in paragraphs 59-62, *supra*.  Bank of Palestine caused these statement to be published publicly on the internet, where they were both accessible and viewed in the District of Columbia, Palestine, the UAE, and elsewhere.  Bank of Palestine made the statements with actual malice, *i.e.*, the Bank of Palestine knew the statements were false based on its longstanding relationship with Mr. Elsalameen.  The Bank of Palestine made the statements:  (a) to retaliate against Mr. Elsalameen

21

for refusing to pay a bribe and (b) to further its conspiracy to defame Mr. Elsalameen with

Palestinian Intelligence.

78.     In addition to the Bank of Palestine's original publication of the false and

defamatory statements through Al Akhbar, the Bank of Palestine is also liable for numerous

foreseeable republications of the false and defamatory statements through Twitter accounts,

Facebook posts, and other social media outlets controlled by the Bank of Palestine's co-

conspirators in Palestinian Intelligence.

79.     The statement that Mr. Elsalameen intended to broker a property transaction that

would result in the transfer of Palestinian-held real property to Israeli settlers is actionable as a

matter of law because, if true, it would constitute treason under Palestinian law.

80.     Mr. Elsalameen has also suffered significant special harm resulting from the Bank

of Palestine's defamatory statements.  He has suffered harm to his reputation, lost business

opportunities, including the opportunity to broker a $1 billion loan at a 10% commission, and has

also lost the opportunity to gain good will in the Middle Eastern business community by

completing the acquisition of the Jerusalem Property.

81.     Bank of Palestine's defamation of Mr. Elsalameen has directly and proximately

caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than

$102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of

Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and

its conduct was outrageous and reckless toward his safety.

### COUNT II
### Conspiracy to Defame

82.     Plaintiff re-alleges and incorporates the allegations set forth above as if fully set

forth herein.

83.     Bank of Palestine and members of the Palestinian Intelligence entered into an agreement in early 2015, the purpose of which was to injure Mr. Elsalameen through the publication of defamatory statements.  Bank of Palestine and its co-conspirators' agreement was facilitated through the close relationships of senior Bank of Palestine officials and senior members of Palestinian Intelligence and the Palestinian National Authority.

84.     Bank of Palestine entered into the conspiracy to defame Mr. Elsalameen in retaliation for Mr. Elsalameen's refusal to pay the Bank of Palestine a $500,000 bribe.  Bank of Palestine's co-conspirators entered into the conspiracy to retaliate against Mr. Elsalameen for: (a) his outspoken criticism of the corruption of the Palestinian National Authority and its President, Mahmood Abbas and (b) his refusal to discredit himself by engaging in similarly corrupt practices.

85.     Bank of Palestine and its co-conspirators caused injury to Mr. Elsalameen by publishing false and defamatory statements about him to the Palestinian Attorney General and, through Al Akhbar, to the public at large, including in the District of Columbia.  Bank of Palestine and its co-conspirators made these false and defamatory publications in furtherance of their conspiracy to injure and discredit Mr. Elsalameen.

86.     Bank of Palestine's conspiracy with Palestinian Intelligence to defame Mr. Elsalameen has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT III**
**Invasion of Privacy – Publicity Concerning the Private Life of Another**

87.     Plaintiff re-alleges and incorporates the allegations set forth above as if fully set

forth herein.

88.     Bank of Palestine made public many matters concerning the private life of Mr. Elsalameen.  These included publishing unredacted copies of his Israeli identity card, his Israeli passport, and his United States passport.  The Bank of Palestine further published details of Mr. Elsalameen and Al Serena's contemplated acquisition of the Jerusalem Property and details of Mr. Elsalameen and Al Serena's Bank of Palestine statements.

89.     It would be highly offensive to a reasonable person to have such personally identifiable information and information regarding private business transactions and accounts disclosed to any third party, much less in a public forum such as Al Akhbar.

90.     The public had no legitimate concern warranting the disclosure of Mr. Elsalameen's personally identifiable information.  Nor does the public have a legitimate concern warranting the disclosure of details of the entirely lawful Jerusalem Property transaction.

91.     Bank of Palestine's invasion of Mr. Elsalameen's privacy has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT IV**
**Invasion of Privacy – False Light**

92.     Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth herein.

93.     Bank of Palestine gave significant publicity to details of the Jerusalem Property transaction, but cast them in a false and deceptive light in order to give the appearance of disloyalty and illegality.

24

94.     Bank of Palestine cast details of the Jerusalem Property transaction in a manner that would be highly offensive to the reasonable person, *i.e.*, the Bank of Palestine cast the information in such a way as to suggest that Mr. Elsalameen is an agent of the Israeli government, under the protection of Shin Bet, and a traitor to Palestine.

95.     The Bank of Palestine had actual knowledge of the true, lawful details regarding the Jerusalem Property transaction through its regular contacts with Mr. Elsalameen, his brother, and his counsel.  Bank of Palestine never made any effort to recant or refute its false and defamatory publications despite being fully aware of the truth.

96.     Bank of Palestine's casting of Mr. Elsalameen in a false light has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

## COUNT V
## Tortious Interference with Contract

97.     Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth herein.

98.     Mr. Elsalameen had a valid contractual relationship with Lamiaa Gouda and her son and attorney-in-fact, Adeeb Jawad Gouda, for the purchase of the Jerusalem Property.

99.     Bank of Palestine knew of the contractual relationship because Mr. Elsalameen provided the Bank of Palestine a copy of the sales agreement and because Mr. Elsalameen had discussed the property transaction with senior Bank of Palestine officials on numerous occasions.

100.    Through the Bank of Palestine's conspiracy with Palestinian Intelligence to defame Mr. Elsalameen, the Bank of Palestine's defamation of Mr. Elsalameen, and the Bank of

Palestine's refusal to release funds for the final tranche owed under the sales agreement from the Al Serena account—absent a $500,000 bribe from Mr. Elsalameen—the Bank of Palestine caused a breach of the sales agreement.

101. Bank of Palestine's tortious interference with Mr. Elsalameen's contract to purchase the parcel of real property in Jerusalem has caused Mr. Elsalameen significant harm to his reputation and standing in the Palestinian and UAE business communities and damages in an amount to be proven at trial, but no less than $2,500,000.00. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous.

## COUNT VI
### Tortious Interference with Business Relations

102. Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth herein.

103. Mr. Elsalameen had a valid business relationship with the government of a Middle Eastern nation and an African nation to broker a $1 billion loan for the African nation. Mr. Elsalameen stood to earn a 10% commission from the successful brokering of the loan.

104. Bank of Palestine knew of the business relationship. Mr. Elsalameen discussed the loan transaction with senior Bank of Palestine official Al Qawasmi, who had encouraged Mr. Elsalameen to open a Bank of Palestine account to accept the commission payment.

105. Through the Bank of Palestine's conspiracy with Palestinian Intelligence to defame Mr. Elsalameen, the Bank of Palestine's defamation of Mr. Elsalameen, the Bank of Palestine's invasions of Mr. Elsalameen's privacy, and the other tortious acts described herein, the Bank of Palestine caused such harm to Mr. Elsalameen's reputation and standing in the relevant business communities that the parties to the contemplated loan agreement terminated

their relationship with Mr. Elsalameen.

106.    Bank of Palestine's tortious interference with Mr. Elsalameen's business relations in brokering a $1 billion loan has caused Mr. Elsalameen significant harm to his reputation and standing in the Middle Eastern business community and damages in an amount to be proven at trial, but no less than $100,000,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous.

## COUNT VII
## Fraud

107.    On March 18, 2016, Bank of Palestine, through the Head of the Diaspora Unit, Salim Hodali, falsely represented to Mr. Elsalameen that the Al Serena account was frozen because the Bank of Palestine required additional documentation pertaining to his identity and his aunt's estate in order to establish who had authority over the account.

108.    This misrepresentation was material.  Whereas the Bank of Palestine had previously indicated that the account was frozen for other reasons, it now represented that eliminating the freeze was merely a matter of administrative paperwork pertaining to Miriam Salameen's estate.

109.    The Bank of Palestine knew that the representation was false, because it never intended to release the funds in the Al Serena account, regardless of the documentation Mr. Elsalameen provided.

110.    The Bank of Palestine intended to deceive Mr. Elsalameen for the purpose of gathering highly sensitive personally identifiable information, such as pictures of Mr. Elsalameen's passports and Israeli identity card, which it would later use to defame him and invade his privacy.

27

111.    Mr. Elsalameen relied on the Bank of Palestine's March 18, 2016 misrepresentation.  Had Mr. Elsalameen known the Bank of Palestine's true intent in requesting the documentation, he never would have provided it to the Bank of Palestine.  Mr. Elsalameen, directly and through his counsel, in reliance on the Bank of Palestine's misrepresentation, in fact provided the Bank of Palestine with copious, private documentation concerning Mr. Elsalameen and the estate of his aunt.

112.    Bank of Palestine's fraud against Mr. Elsalameen has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

## COUNT VIII
### Civil Conspiracy

113.    Plaintiff re-alleges and incorporates the allegations set forth above as if fully set forth herein.

114.    Bank of Palestine and members of the Palestinian Intelligence entered into an agreement in early 2015, the purpose of which was to injure Mr. Elsalameen through multiple unlawful acts, including invasion of privacy, tortious interference with contract, tortious interference with business opportunity, solicitation of a bribe, and making false reports to Palestinian government officials, including the Palestinian Attorney General.  Bank of Palestine and its co-conspirators' agreement was facilitated through the close relationships of senior Bank of Palestine officials and senior members of Palestinian Intelligence and the Palestinian National Authority.

115.    Bank of Palestine entered into the conspiracy in retaliation for Mr. Elsalameen's

refusal to pay the Bank of Palestine a $500,000 bribe.  Bank of Palestine's co-conspirators entered into the conspiracy to retaliate against Mr. Elsalameen for:  (a) his outspoken criticism of the corruption of the Palestinian National Authority and its President, Mahmood Abbas and (b) his refusal to discredit himself by engaging in similarly corrupt practices.

116.    Bank of Palestine and its co-conspirators caused injury to Mr. Elsalameen by publishing false and defamatory statements about him to the Palestinian Attorney General and, through Al Akhbar, to the public at large, including in the District of Columbia, invading his privacy, and interfering with his business activities.  Bank of Palestine and its co-conspirators undertook each of these actions in furtherance of their conspiracy to injure and discredit Mr. Elsalameen.

117.    Bank of Palestine's conspiracy with Palestinian Intelligence has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $102,500,000.00.  Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

### DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and a judgment against Defendant as follows:

A.    entering judgment against Defendant and in favor of Plaintiff for each count alleged in this Complaint;

B.    awarding Plaintiff compensatory damages in an amount to be determined at trial, but of no less than $102,500,000.00 plus pre- and post-judgment interest, special, punitive, and

other allowable damages, as well as Plaintiff's reasonable attorneys' fees and costs;

C.      retaining jurisdiction for the purpose of enabling Plaintiff to apply to the Court for

such further orders and directions as may be necessary or appropriate for the construction or

carrying out of any orders made in this action, for the modification of any such orders, for

enforcement of compliance therewith and punishment of any violations thereof; and

D.      awarding Plaintiff all other relief the Court deems just and proper.

Dated:  October 5, 2016                    Respectfully submitted,

**FADI ELSALAMEEN**

By:      /s/ Nigel L. Wilkinson
         Nigel L. Wilkinson (D.C. Bar No. 466221)
         Benjamin G. Chew (D.C. Bar No. 418577)
         Rory E. Adams (D.C. Bar No. 986549)
         Manatt, Phelps & Phillips LLP
         1050 Connecticut Avenue NW, Suite 600
         Washington, DC 20037
         Telephone:      (202) 585-6637
         Facsimile:      (202) 585-6600
         Email:          nwilkinson@manatt.com
         Email:          bchew@manatt.com
         Email:          radams@manatt.com

         *Counsel for Plaintiff Fadi Elsalameen*

203694329.1