**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FADI ELSALAMEEN**<br>2856 Arizona Avenue NW<br>Washington, DC 20016,<br><br>Plaintiff,<br><br>v.<br><br>**BANK OF PALESTINE, P.L.C.**<br>Bank of Palestine Building<br>Nazlet Al Mahkamah Street<br>Ain Misbah<br>Ramallah, Palestinian Territory,<br><br>Defendant. | Case No. 16-cv-1976<br><br>**JURY TRIAL DEMAND** |

## SECOND AMENDED COMPLAINT

This lawsuit seeks redress for the unlawful and corrupt actions of Defendant Bank of Palestine, P.L.C. ("Bank of Palestine"), which it undertook in a prolonged, calculated effort to discredit, threaten, extort, and silence Plaintiff Fadi Elsalameen ("Mr. Elsalameen"), an American citizen of Palestinian descent born in Israel and raised in the Palestinian territories ("Palestine"), due to his public criticism of Palestinian President Mahmoud Abbas, the current Palestinian regime, and other powerful Palestinian institutions and individuals. As part of its scheme, Bank of Palestine, acting alone or in concert with Palestinian government officials, defamed Mr. Elsalameen, invaded his privacy, cast him in a false light, tortiously interfered with a valid contractual relationship, and intentionally inflicted emotional distress upon him. Among other harms, Bank of Palestine's actions have placed Mr. Elsalameen and his family at physical risk and resulted in death threats against Mr. Elsalameen, a life-threatening commando-style attack on his family's residence in Palestine, and physical surveillance of Mr. Elsalameen's

Washington, D.C. home. Bank of Palestine's actions necessitated extensive security when Mr. Elsalameen visited Palestine and have effectively precluded his return due to security concerns, thus preventing him from pursuing business opportunities or personal relationships, including visiting his extended family, in Palestine, where he grew up. Bank of Palestine's actions damaged Mr. Elsalameen's reputation and standing in the business community and scuttled valuable business opportunities. In support of his claims against Bank of Palestine, Mr. Elsalameen alleges as follows:

## **<u>JURISDICTION AND VENUE</u>**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Mr. Elsalameen is a citizen of the United States, was a citizen of the District of Columbia when most of the actions complained of herein took place, and now is a citizen of the state of North Carolina; Bank of Palestine is a citizen of Palestine, Bank of Palestine is not domiciled in the District of Columbia or North Carolina, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Elsalameen's claims occurred in the District of Columbia. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) because Bank of Palestine is subject to the Court's personal jurisdiction with respect to this action.

## **<u>PARTIES</u>**

### *<u>Fadi Elsalameen</u>*

3. Fadi Elsalameen is a resident and citizen of the United States. Mr. Elsalameen is also an Israeli citizen of Palestinian descent.

4. At relevant times, Mr. Elsalameen resided in the District of Columbia and the harm he suffered to his reputation and business interests due to Bank of Palestine's actions occurred here, as did the emotional suffering Bank of Palestine's actions caused. As of the date of filing, Mr. Elsalameen still owns a home within the District of Columbia, but since 2017, his primary residence has been in North Carolina.

5. Mr. Elsalameen was born in Beersheba, Israel, and raised in Hebron in Palestine. His parents had limited formal education, and his family was of modest means.

6. From an early age, Mr. Elsalameen excelled academically. On this basis, he was selected to serve as a Palestinian delegate for the Seeds of Peace program, an international peacebuilding and leadership development organization.

7. With assistance from directors of the Seeds of Peace program, he applied for and attended high school, college, and graduate school in the United States. He ultimately earned a master's degree in international relations and economics from the Johns Hopkins University School of Advanced International Studies in Washington, D.C.

8. After completing graduate school, Mr. Elsalameen temporarily moved back to Palestine. While in Palestine, Mr. Elsalameen became increasingly troubled by the inequity, oppression, and mismanagement he observed in Palestinian society, and the role that Palestinian governmental and corporate corruption and self-dealing played in Palestinian suffering.

9. Mr. Elsalameen became a U.S. citizen in 2010 and settled permanently in Washington, D.C., in 2011. He began a career in international investment and development, with a focus on bringing food and technology to developing regions in the Middle East. Simultaneously, he began to publish information on the internet and to otherwise speak out about

corrupt and unjust practices of Palestinian governmental officials, institutions, and wealthy citizens.

10. In 2011, Mr. Elsalameen joined an investment firm focused on managing assets in the developing world. There, Mr. Elsalameen worked on business development projects centered in the Middle East.

11. Mr. Elsalameen supports and works to advance the legitimate government institutions of Palestine and the interests of the Palestinian people. He frequently criticizes corrupt and opaque practices among individuals within the current Palestinian administration and corrupt Palestinian business entities such as Bank of Palestine. Mr. Elsalameen has also been an outspoken critic of the current President of the Palestinian National Authority, Mahmoud Abbas.

*Bank of Palestine, P.L.C.*

12. Bank of Palestine is one of the largest Palestinian banks. It is a public shareholding company organized under the laws of the Palestinian National Authority. Its principal place of business is in Ramallah in the West Bank. Bank of Palestine maintains one or more correspondent accounts in the United States with Citigroup, Inc., and maintains a registered agent in New York for purposes of accepting service of process from the Secretary of the Treasury or the Attorney General of the United States pursuant to 31 U.S.C. § 5318(k).

13. Bank of Palestine has significant contacts with the District of Columbia.

14. For example, Bank of Palestine solicits capital from investors within the District of Columbia. In its 2016 Annual Report, Bank of Palestine disclosed that its Investor Relations Department conducted a "USA Road Show" in Washington, D.C., in December 2016. According to the disclosure, this Road Show was part of "an active networking [process] developing investor relations spanning different regions of the globe."

15. Bank of Palestine has received tens of millions of dollars in original commitments from the International Finance Corporation's Global Trade Finance Program in the District of Columbia. The International Finance Corporation is an arm of the World Bank, located at 2121 Pennsylvania Avenue NW, Washington, D.C. 20433.

16. Bank of Palestine receives guarantees covering payment risk for trade-related transactions through the District of Columbia-based International Finance Corporation, permitting it to issue letters of credit for import–export transactions.

17. Bank of Palestine's further cooperation with the District of Columbia-based International Finance Corporation resulted in an equity investment of up to ten percent of Bank of Palestine's market capitalization, a student loan facility supported by the Palestinian Education Fund, and a housing finance initiative to provide affordable housing.

18. Bank of Palestine's affordable housing initiative is a $500 million program that provides loans to low- and middle-income Palestinian households. Of the $500 million, Bank of Palestine received $325 million from the Overseas Private Investment Corporation, a U.S. Government development finance institution which is located in the District of Columbia at 1100 New York Avenue NW, Washington, D.C. 20527. The International Finance Corporation provided $75 million in loan guarantees for the affordable housing initiative.

19. Bank of Palestine is a member of the Institute of International Finance located in the District of Columbia. The Institute of International Finance is a think tank that actively advocates for regulatory, financial, and economic policies that are in the interests of its members. It is headquartered at 1333 H Street NW, Suite 800E, Washington, D.C. 20005.

20. Bank of Palestine operates an interactive website in English and other languages that provides online banking services to customers worldwide, including within the District of

Columbia. According to its website, "[t]hrough internet banking, clients are able to control their money and conduct transactions on their accounts around the clock without being restricted to official working hours."

21. On information and belief, Bank of Palestine knowingly engages individuals located within the District of Columbia to facilitate business transactions with customers within the District of Columbia. For example, in 2017, Bank of Palestine knew Mr. Elsalameen lived and worked in Washington, D.C., and arranged for him to meet with Maen Areikat, a Palestinian diplomat, in the District of Columbia, regarding Mr. Elsalameen's account at Bank of Palestine.

22. Bank of Palestine intentionally caused or participated in a scheme to cause defamatory statements to be published about Mr. Elsalameen, whom Bank of Palestine knew to live and work in Washington, D.C. In causing the statements to be published, Bank of Palestine intended to have an effect upon Mr. Elsalameen's employment and personal safety within the District of Columbia.

23. Bank of Palestine intentionally caused or participated in a scheme to cause a photograph of Mr. Elsalameen's home in the District of Columbia to be published in Al Akhbar, an online news site that is widely read in the Middle East and throughout the world, including in the District of Columbia, and that is a known news outlet for the terrorist organization Hezbollah. Bank of Palestine's actions in this regard thus knowingly endangered Mr. Elsalameen's physical safety in the District of Columbia.

24. Bank of Palestine intentionally caused or participated in a scheme to cause false and defamatory information regarding Mr. Elsalameen to be published in Al Akhbar, an online news site that is available for viewing in the Middle East and throughout the world, including in the District of Columbia, and that is a known news outlet for the terrorist organization

Hezbollah. Bank of Palestine's actions in this regard thus knowingly endangered Mr. Elsalameen's physical safety, employment, and business opportunities in the District of Columbia.

## RELEVANT NON-PARTIES

25. The Palestinian Monetary Authority is the foreign banking authority that licenses and regulates Bank of Palestine's banking activities.

26. The Palestinian Security Services is an organization comprised of multiple divisions, including a Preventive Security Force and the Mukhabarat, which are nominally responsible for internal intelligence activities and the monitoring of opposition groups within Palestine (collectively, "Palestinian Intelligence").

27. Al Serena International Trade and Investment Company ("Al Serena") is a Palestinian limited liability company, which was registered under registration number 562527804 on September 26, 2013. Mr. Elsalameen is the sole shareholder and principal of Al Serena.

28. Muawiah Al Qawasmi ("Mr. Al Qawasmi") is Bank of Palestine Area Manager of the Southern West Bank.

29. Al Akhbar is an online news publication. On information and belief, Al Akhbar is a known news outlet for the terrorist organization Hezbollah, which owns and funds it.

30. Hashim Shawa is the Chairman of Bank of Palestine.

31. Major General Majed Faraj, also known as Majid Faraj, is the Director of Palestinian Intelligence agency Mukhabarat.

32. Nasser Al-Laham is an on-air reporter for the Hezbollah-owned and Al Akhbar-affiliated news agency Al-Manar.

33. Mohammad Mustafa is the Chairman of the Palestinian Investment Fund and former Deputy Prime Minister for Economic Affairs of the Palestinian National Authority.

34. Shukri Bishara is the current Palestinian Minister of Finance.

## FACTUAL ALLEGATIONS

*Mr. Elsalameen's Outspoken Criticism of the Palestinian National Authority*

35. Since approximately 2011, Mr. Elsalameen has been an outspoken critic of the Palestinian National Authority, its president, Mahmoud Abbas, and related Palestinian institutions. Mr. Elsalameen criticized, among other things, President Abbas' corruption, that he has remained in office beyond his term limit, and that he has failed to call national elections.

36. For example, Mr. Elsalameen has published articles critical of the Palestinian National Authority through Al Jazeera, the Huffington Post, and the Maan News Agency. His criticisms have been featured in multiple other news outlets, including the Times of Israel, the Economist, and Haaretz. He has given critical interviews on CNN and CCTV America.

37. Mr. Elsalameen's social media accounts, through which he regularly provides critical comment on the Palestinian National Authority and President Abbas, have more than 920,000 followers in Palestine and elsewhere. Through these accounts, Mr. Elsalameen provides a platform for Palestinian citizens, struggling with the oppression and corruption of the Palestinian National Authority, to publicize their stories.

38. Mr. Elsalameen's well-published and outspoken critiques of corruption within the Palestinian National Authority and by President Abbas have earned him respect throughout Palestine and the Middle East as an opponent of the ruling regime, but on information and belief have angered President Abbas and others in powerful positions within the Palestinian National Authority.

*Bank of Palestine Has Close and Corrupt Ties to the Palestinian National Authority and Palestinian Intelligence*

39. Bank of Palestine has close ties to the Palestinian National Authority and Palestinian Intelligence. Bank of Palestine is the largest lender to the Palestinian National Authority. The son of Palestinian President Abbas is a close personal friend of Bank of Palestine Chairman Hashim Shawa. Hashim Shawa is also a close personal friend of Shukri Bishara, the Minister of Finance. And Azzam Shawwa, Governor of the Palestinian Monetary Authority, is a cousin of Hashim Shawa, Chairman of Bank of Palestine.

40. Bank of Palestine and Palestinian government agencies regularly enter into joint business relationships. For example, the Palestinian National Authority pays its employees' salaries using loans from Bank of Palestine.

41. On information and belief, many of the joint business activities conducted by Bank of Palestine and Palestinian government agencies are unlawful. For example, on information and belief, senior Palestinian government officials and senior Bank of Palestine officials have conspired to fix stock prices, and at least one Bank of Palestine official has unlawfully accepted kickbacks for Bank of Palestine contracts.

42. As set forth herein, Bank of Palestine and Palestinian Intelligence officials conspired to defame Mr. Elsalameen, cast him in a false light, invade his privacy, tortiously interfere with a valid contractual relationship, and intentionally inflict emotional distress upon him—motivated by the desire to silence and discredit an outspoken critic of President Abbas and the Palestinian National Authority, and by Mr. Elsalameen's refusal to engage in the corrupt practices that Bank of Palestine officials use to extort money from Palestinian citizens and business entities.

*Elsalameen Forms Al Serena to Broker Purchase of Jerusalem Property and Opens Account at Bank of Palestine*

43. In September 2013, Mr. Elsalameen and his aunt, Mariam Salameen, established Al Serena. Al Serena was created to serve as an agent for a United Arab Emirates ("UAE") entity, Al-Thuraya Consultancies and Research Company ("Al-Thuraya"), to effect the purchase of a parcel of real property and its improvements in Jerusalem as identified in Register 1015, page 3035, of the Old Town Land Records of Jerusalem (the "Jerusalem Property").

44. Al Serena's registered place of business is located in the West Bank city of Hebron. Although located in Hebron, Al Serena primarily conducted business through its principal, Mr. Elsalameen, from the District of Columbia.

45. Although Al-Thuraya agreed to cover Al Serena's and Mr. Elsalameen's expenses in effecting the property transfer, Al-Thuraya was not otherwise providing monetary compensation to Al Serena or Mr. Elsalameen. Rather, by acting as Al-Thuraya's agent in the property transfer, Al Serena and Mr. Elsalameen stood to gain significant goodwill within the UAE business community and anticipated that the goodwill would help to secure additional lucrative business relationships.

46. Following the formation of Al Serena, the company opened an account with Bank of Palestine and funded the account with $2 million transferred from Al-Thuraya.

47. Mr. Elsalameen had numerous conversations with Bank of Palestine officials regarding the purpose of the account and the reasons for placing the funds within. In particular, Bank of Palestine understood that the funds were to be used to facilitate the purchase of the Jerusalem Property on behalf of Al-Thuraya, a UAE entity.

48. In furtherance of the property acquisition, on November 5, 2014, Mr. Elsalameen entered into a preliminary property sales agreement with Lamiaa Gouda, an heir to the title of the Jerusalem Property, and her son and attorney-in-fact, Adeeb Jawad Gouda.

49. The purchase price for the property was $2.5 million, payable in tranches. The first tranche of $1,520,000 was due upon signing the agreement.

50. Mr. Elsalameen caused Al Serena to pay the first tranche, of which $1 million was transferred from Al Serena's account with Bank of Palestine.

51. The second tranche of $980,000 was due once Ms. Gouda was able to obtain clear title to the property from other heirs and record title to the Jerusalem Property in Israel's land registry.

*The Conspiracy Between Bank of Palestine and Palestinian Intelligence*

52. As discussed below, in or around early 2015, Bank of Palestine and Palestinian Intelligence entered into an agreement to advance their mutually beneficial yet unlawful goals. Knowing that Mr. Elsalameen's company now had an account with Bank of Palestine, Bank of Palestine attempted to induce Mr. Elsalameen to pay a bribe for its own gain and to tarnish Mr. Elsalameen's reputation as a respected and outspoken critic of the current Palestinian government's corrupt and unlawful practices. Mr. Elsalameen immediately rejected the request to pay a bribe.

53. When Mr. Elsalameen refused Bank of Palestine's entreaty to engage in corrupt practices, Bank of Palestine and Palestinian Intelligence changed tactics, conspiring to solicit sensitive, personal information from Mr. Elsalameen to invade his privacy, and to retaliate against Mr. Elsalameen for his opposition to corruption in the Palestinian Authority, and to silence that opposition by disseminating his personal information in concert with defamatory

allegations against Mr. Elsalameen that the Bank of Palestine knew to be false through the Hezbollah-owned and operated Al Akhbar news outlet.

54. The harm Mr. Elsalameen has experienced from these invasions and wrongful acts has been profound, totaling millions of dollars and severe emotional suffering.

*Bank of Palestine Demands Bribes to Access Account*

55. In order to protect the property while awaiting title, Mr. Elsalameen employed security guards around the property. To pay the security guards, Mr. Elsalameen sent a request to Bank of Palestine from the District of Columbia on April 16, 2015, requesting that Bank of Palestine disburse $9,000 to Mr. Elsalameen's brother.

56. When Mr. Elsalameen's brother went to the Hebron branch of Bank of Palestine on behalf of Mr. Elsalameen to collect the $9,000, Bank of Palestine Area Manager of Southern West Bank, Mr. Al Qawasmi, informed him that the account had been frozen.

57. Mr. Elsalameen's brother demanded documentation or confirmation that the account was lawfully frozen, which Mr. Al Qawasmi refused to provide. At a meeting at Mr. Al Qawasmi's home, Mr. Al Qawasmi informed Mr. Elsalameen's brother that Mr. Elsalameen was "in trouble" with Palestinian authorities and intimated that Bank of Palestine was under political pressure from the Palestinian National Authority to freeze the account.

58. In May 2015, in an effort to understand and correct Bank of Palestine's unlawful freeze of Al Serena's account, Mr. Elsalameen flew to Kuwait from Washington, D.C. to meet personally with Mr. Al Qawasmi. At the meeting, Mr. Al Qawasmi reiterated to Mr. Elsalameen that his Al Serena's account was frozen but nonetheless assured him that he would be able to access the funds. Mr. Al Qawasmi told Mr. Elsalameen that Mr. Al Qawasmi would open a new company account, that Mr. Elsalameen would need to transfer the funds from Al Serena's

account to the new account, and that Mr. Al Qawasmi would give Mr. Elsalameen the funds in cash or check. Mr. Elsalameen refused, finding this option suspect and unacceptable. There was no lawful basis for Bank of Palestine to require Mr. Elsalameen to undertake this complicated and unusual procedure to have access to the funds in the Al Serena account.

59. Mr. Elsalameen continued, from the District of Columbia, to communicate with Mr. Al Qawasmi directly and through Mr. Elsalameen's trusted friend, Nabil Al Jabari. Mr. Al Qawasmi expressly informed Mr. Al Jabari that Bank of Palestine would not unfreeze the account unless Mr. Elsalameen agreed to pay a $500,000 bribe in exchange.

*Bank of Palestine Continues Unlawfully to Refuse Access to Al Serena Funds*

60. On December 14, 2015, the property records for the Jerusalem Property were updated in the Israeli land registry, showing that title to the property was clear and vested in a single individual.

61. On January 24, 2016, Mr. Elsalameen caused an irrevocable power of attorney to be recorded with the Israeli land registry. This document provided notice of the sales transaction and that title would vest in Mr. Elsalameen upon completion of the sales transaction, i.e., once Mr. Elsalameen caused Al Serena to pay the final tranche of $980,000.

62. On the suggestion of acquaintances in the UAE, Mr. Elsalameen attempted to work with a different Bank of Palestine official, Omnia Faisal AbuShahla, the Diaspora Officer in Gaza.

63. Accordingly, on March 15, 2016, Mr. Elsalameen requested that Ms. AbuShahla transfer the sum of $980,000 to an account for the seller. Bank of Palestine, however, refused to effect the funds transfer, again insisting that the account was frozen, but now for the first time contending that Bank of Palestine required documentation regarding the death of

Mr. Elsalameen's aunt and current authority over the account in order to allow Mr. Elsalameen to access the funds in the account. As described below, this explanation was false and designed to induce Mr. Elsalameen to share extensive, personal documentation with Bank of Palestine, which later was transferred by Bank of Palestine, directly or indirectly, to Al Akhbar, a Hezbollah news outlet, where it was illegally reproduced and disclosed.

*Bank of Palestine Colludes with Palestinian Intelligence to Gather Confidential Information Regarding Mr. Elsalameen*

64. On March 18, 2016, Mr. Elsalameen wrote to the head of Bank of Palestine's Diaspora Unit, Salim Hodali, to inform Mr. Hodali that he had learned that a Bank of Palestine official had informed Palestinian Intelligence about the Al Serena account and that Palestinian Intelligence officials had interrogated the son of the owner of the Jerusalem Property. Mr. Elsalameen told Mr. Hodali, "I have nothing to hide. Everything I do is above the table. I might criticize Abbas but I am not part of any illegal activities against him or anyone else. My record is clean and criticism of anyone is not a crime."

65. Bank of Palestine, acting improperly at the behest of Palestinian Intelligence, misled Mr. Elsalameen regarding the status of the account in order to induce Mr. Elsalameen to send Bank of Palestine multiple documents showing his personal identity information. Specifically, on March 20, 2016, Bank of Palestine's Diaspora Unit informed Mr. Elsalameen that the *only* issue with transferring funds from the Al Serena account was determining who had signatory authority over the account following the death of Mr. Elsalameen's aunt on May 7, 2015.

66. Bank of Palestine specifically demanded that Mr. Elsalameen provide his personal identity information, including his passports and Israeli identity card, in order to regain access to the funds. This unnecessary and improper demand for information served as an excuse to

acquire Mr. Elsalameen's personal identity information. It is readily demonstrable that Bank of Palestine did not need Mr. Elsalameen's personal identity information to "unfreeze" the account following the death of his aunt, because Bank of Palestine had informed him that his account was "frozen" in April 2015, *before* the death of his aunt.

67. Bank of Palestine's representations were false, both because it did not require Mr. Elsalameen's personal identity information to transfer his funds as requested, and because Bank of Palestine never intended to use that information for official Bank of Palestine business. Rather, in obtaining Mr. Elsalameen's documentation, Bank of Palestine intended to wrongfully transfer those documents to Palestinian Intelligence, to be used for improper purposes in order to target Mr. Elsalameen and endanger his personal safety and damage his reputation.

68. Relying on Bank of Palestine's representations, Mr. Elsalameen, through his Palestinian counsel, cooperated fully with Bank of Palestine and with the Palestinian Companies Controller within the Ministry of National Economy. Mr. Elsalameen sought to establish: (a) his authority over the Al Serena account; and (b) the lawful purpose of the transfer.

69. To that end, Mr. Elsalameen sent Bank of Palestine officials a copy of the property sales agreements (one between Mr. Elsalameen and the owners of the Jerusalem Property, one between Al Serena and Al-Thuraya) and photographs Mr. Elsalameen had taken of his United States passport, Israeli passport, and Israeli identity card. These photographs are readily recognizable because they were taken with Mr. Elsalameen's iPhone.

70. Without any legal justification and in furtherance of a conspiracy to defame and otherwise injure Mr. Elsalameen, Bank of Palestine promptly transmitted the photos of these sensitive documents to its co-conspirators in Palestinian Intelligence, for publication in Al Akhbar.

*Palestinian Intelligence Officers Intimidate and Harass Property Owner*

71. Bank of Palestine and Palestinian Intelligence had regular communications regarding Mr. Elsalameen about the purchase of the Jerusalem Property. Upon learning from Bank of Palestine that title to the Jerusalem Property was clear and that Mr. Elsalameen was attempting to complete the transaction, Palestinian Intelligence officers called upon the property owner's son and interrogated him.

72. The Palestinian Intelligence officers informed the owner's son that they knew he was attempting to transfer the property to Mr. Elsalameen. The intelligence officers falsely accused Mr. Elsalameen of collaborating with Israelis to sell the property to Israeli Jews, an act that is considered to be treason and punishable by death under applicable Palestinian law.

73. The Palestinian Intelligence officers knew that this accusation was false from their collaboration with Bank of Palestine. They knew, instead, that the property transaction was entirely lawful and for the benefit of a UAE entity.

74. The Palestinian Intelligence officers demanded that the property owner's son meet with Palestinian President Abbas and sell the property to him, rather than to Mr. Elsalameen.

75. When the property owner's son refused to bow to the Palestinian Intelligence officers' demands, they retaliated by causing his Bank of Palestine accounts to be frozen as well.

*Bank of Palestine and Palestinian Intelligence Officials Conspire to Defame Mr. Elsalameen*

76. While Mr. Elsalameen attempted to provide Bank of Palestine the documentation it demanded under false pretenses, the Palestinian Companies Controller facilitated a telephone call between Mr. Elsalameen's counsel and a member of Palestinian Intelligence regarding a security clearance to transfer shares of Al Serena through probate.

77. Mr. Elsalameen himself promptly made contact with the Palestinian Intelligence official. The official informed Mr. Elsalameen, "I have a lot of respect for you. This is a fight

from powers above me." The official further informed Mr. Elsalameen that the property transaction was, in fact, lawful, noted Mr. Elsalameen's criticism of Palestinian President Abbas, and admitted that he was following orders from the highest levels of Palestinian Intelligence, namely Major General Majed Faraj, the head of the Palestinian Intelligence agency known as Mukhabarat.

78. On information and belief, Bank of Palestine Chairman, Hashim Shawa, and Major General Majed Faraj met in person in Ramallah to enter into a conspiracy on behalf of their respective organizations, to solicit Mr. Elsalameen's personal information and publicly defame him via publication in Al Akhbar.

79. On information and belief, Majed Faraj has close ties with Hezbollah, a terrorist organization that runs the news outlet, Al Akhbar.

80. Mr. Faraj closely affiliates with Nasser Al-Laham, a reporter for Al-Manar, a Hezbollah owned television station that broadcasts in Palestine.

81. On information and belief, Bank of Palestine and Palestinian Intelligence provided the Palestinian Attorney General with defamatory information that Bank of Palestine and Palestinian Intelligence knew to be false indicating that Mr. Elsalameen was an agent of the Israeli government and intended to transfer the Jerusalem Property to Israeli Jewish settlers. Based upon this false and defamatory information, on April 7, 2016, approximately one year after Mr. Elsalameen was first denied access to the Al Serena account, the Ramallah Court of First Instance issued a provisional seizure order, ordering that the Al Serena account be frozen. Had Bank of Palestine and Palestinian Intelligence officials provided truthful, non-defamatory information to the Palestinian Attorney General, i.e., that the property transaction was a lawful

transfer for the benefit of a UAE entity and that Mr. Elsalameen was not an agent of the Israeli government, the Court would not have issued the provisional seizure order.

82. Palestinian Intelligence officials, armed with information and documentation Mr. Elsalameen provided only to Bank of Palestine, approached the owner of the property and attempted to induce him to publish or cause to be published a false and defamatory article regarding Mr. Elsalameen claiming that Mr. Elsalameen was an Israeli agent who intended to transfer the Jerusalem Property to Israeli Jews. When the property owner refused, the conspirators—Bank of Palestine and Palestinian Intelligence—resorted to publishing defamatory articles themselves through other means.

83. On information and belief, Bank of Palestine and agents of the Palestinian government were reluctant to publish false and defamatory statements regarding Mr. Elsalameen directly. This is because they knew the property transfer was, in fact, a lawful property transaction for the benefit of a UAE entity. The Palestinian government was wary of souring political relations with the government of the UAE. Likewise, Bank of Palestine was wary of souring relations with the government of the UAE because, among other reasons, it was set to open an overseas office in the Dubai International Financial Centre in the UAE in May 2016.

84. Accordingly, Bank of Palestine and Palestinian Intelligence officials caused false and defamatory articles to be published through Al Akhbar, an online news publication owned and controlled by Hezbollah. This would permit both the Palestinian National Authority and Bank of Palestine to hide their role in publishing the false and defamatory articles.

85. On information and belief, after Bank of Palestine provided the information to be published, Majed Faraj leveraged his relationship with Hezbollah to cause the publication of

articles containing Mr. Elsalameen's personal identity information as well as numerous defamatory accusations regarding Mr. Elsalameen's business practices.

86. On information and belief, under the direction of Majed Faraj and Hashim Shawa, Nasser Al-Laham authored the defamatory articles regarding Mr. Elsalameen and issued them to Al Akhbar for worldwide publication.

87. Bank of Palestine and Palestinian Intelligence officials published or caused to be published the first article through Al Akhbar on May 27, 2016. The article contains numerous defamatory statements that Bank of Palestine knew to be false. Those statements, read alone or in context, either imply or expressly state that Mr. Elsalameen was working as an agent of Israel to sell the property to Israeli Jews, an act considered to be treason and punishable by death under applicable Palestinian law:

a. For example, it claims that Mr. Elsalameen's goal in the property transaction "is to repeat an exodus of the magnitude of the Palestinian Exodus of 1948, specifically to chase [Palestinians] out of Jerusalem."

b. It accuses Mr. Elsalameen of attempting "to demographically transform the Occupied City into Israel's capital . . . with the hope that this will bring an end to one of the main outstanding issues in the path of settlement, or in other words sell the most important part of what is left of Palestine."

c. The article implies that Mr. Elsalameen sought to "buy up property from Jerusalemites, under the pretext [of] buying them from those who can no longer live in the Old City . . . despite the fact that these properties are being sold to Israeli associations . . . and thus the people of the

neighborhood wake up to find settlers among them claiming to now be legal owners."

d. The article claims that Mr. Elsalameen's "employer usually uses him for issues that are far more complex than the sale of Jerusalem's houses to Israel!"

e. The article implies that Mr. Elsalameen's goal was the "judaization of the area surrounding Al-Aqsa, and, secondly, a de facto judaization of the [Al-Aqsa] Mosque."

f. The article attempts to implicate Mr. Elsalameen in "the scandals of third-party sales to settlers."

g. The article states that "it is easy for [Elsalameen] to claim that he bought the house in order to 'protect it' from falling into settlers' hands. However, given assignment of the house to a UAE company while the houses around the property and in other neighborhoods are falling, one after the other, into Jewish hands, given the large sum being paid in the deal, . . . given the means by which he obtained Israeli citizenship, and given the legal facilities provided to him, which would have been impossible to obtain if the work was 'national' . . . these factors necessarily implicate him from beginning to end."

h. The article questions how Mr. Elsalameen could have formed Al Serena "in light of the fact that he has combatted and insulted [the Palestinian National Authority's] President, Mahmoud Abbas, and disclosed documents showing [the Palestinian National Authority's corruption]."

88. The article contains information regarding contracts and transactions that Mr. Elsalameen had provided exclusively to Bank of Palestine, thus demonstrating that the article is traceable to Bank of Palestine. For example, the article contained detailed descriptions of the property sales contract between Mr. Elsalameen and the property owners, on the one hand, and the contract between Al Serena and Al-Thuraya on the other. The detailed information included not only the names of all parties, but detailed information regarding the tranches of payments. The article also disclosed that Mr. Elsalameen had already provided the initial tranche of $1,520,000 for the property. This information was confidential, and it would not have been provided to the Palestinian National Authority or bank regulators in the ordinary course. In short, Bank of Palestine acted wrongfully in providing the information either directly or indirectly to Al Akhbar.

89. Bank of Palestine wrongfully provided copies of the same documents and records to Palestinian Intelligence officials in furtherance of their conspiracy to defame and harm Mr. Elsalameen.

90. Bank of Palestine's participation in the foregoing conspiracy was not limited to sharing documents and information pertaining to the property sale. The article also references a $10,000 payment from Mr. Elsalameen to an attorney in Switzerland, something that would only be revealed through confidential Bank of Palestine account statements. Bank of Palestine opened its books to its co-conspirators in Palestinian Intelligence in order to portray Mr. Elsalameen as an Israeli agent intent on alienating Palestinian-held property to Israeli Jewish settlers.

91. Bank of Palestine had no legitimate or lawful basis for providing the foregoing documents and information to Palestinian National Authority agencies including but not limited to Palestinian Intelligence or to Al Akhbar or any media outlets.

92. Bank of Palestine and Palestinian Intelligence authorities published or caused to be published a second article through Al Akhbar, also on May 27, 2016. The article contains numerous false and defamatory statements and gross invasions of Mr. Elsalameen's privacy.

a. The article falsely accuses Mr. Elsalameen of having the protection of Shin Bet, Israel's internal security service.

b. The article implies that Mr. Elsalameen is an agent of Israel and unlawfully obtained Israeli citizenship. Specifically, the article falsely asserts that Mr. Elsalameen was born in Hebron, asserting that anyone born in Hebron would only have been entitled to a green Palestinian identity card, rather than a blue Israeli identity card.

c. The article accuses Mr. Elsalameen of being a Vice President at a shipping company involved in war crimes in Liberia and suggests that Mr. Elsalameen may be involved in a maritime registration company that is "specifically able to camouflage the registration of transport liners for weapons vessels in transactions that are beyond legal coverage, including to the Middle East as an example."

d. The article falsely accuses Mr. Elsalameen of treason for having assisted in the transfer of property from Palestinian to Israeli Jewish hands, asserted to be a capital offense under Palestinian law.

e. The article contains photographs of identity documents, which Mr. Elsalameen had provided *only* to Bank of Palestine.

f. One of the documents published in the article was Mr. Elsalameen's Israeli identity card. The image in the article reproduces a photo of the identity card that Mr. Elsalameen had taken and provided to Bank of Palestine, and no one else, at Bank of Palestine's request. The version of the identity card published in the article contained no redactions and disclosed publicly Mr. Elsalameen's personal identity information.

g. The article also published copies of Mr. Elsalameen's Israeli and Untied States passports that he had provided *only* to Bank of Palestine at its request, and to no one else, again, without any redactions:






h. The article published Mr. Elsalameen's home address in Washington, D.C., pictures of his home from the street, details of his mortgage and a line of credit, and information regarding his political contributions in the United States.

93. The second article also reveals the motive of Bank of Palestine and its co-conspirator. The article states that Mr. Elsalameen is a "fat cat despite his slender build" who works with an investment capital and private equity firm "headed by a Jew." The article explains that "[e]ver since the year 2011 at least, Elsalameen began criticizing Abbas, describing him as 'an ineffective ambassador for Palestine at international organizations' such as the United Nations." "He called on him numerous times to resign from his post." "In 2011, in his capacity as a member of the New America Foundation, he published a few articles on the Qatari Al Jazeera site and the Israeli Haaretz page calling for both Abbas and Fayyad to resign after 'two decades of failed policies.'"

94. On May 27, 2016, Bank of Palestine and Palestinian Intelligence authorities caused the publication of additional articles through Al-Quds News Agency and Watanserb.

These articles repeat numerous false and defamatory statements from the Al Akhbar articles. They also published unredacted copies of Mr. Elsalameen's passports and identification documents.

95. Bank of Palestine and Palestinian Intelligence authorities published or caused to be published a third article through Al Akhbar on May 31, 2016. The article contains multiple false and defamatory statements.

a. The article repeats the defamatory claim, made in the previous articles and known by Bank of Palestine to be false, that Mr. Elsalameen was working as an agent of Israel to sell the property to Israeli Jews, a crime considered to be treason and punishable by death under applicable Palestinian law.

b. The article alleges that Mr. Elsalameen's property transaction was funded by Mohammed Dahlan, a political opponent of President Abbas, and characterizes the funds involved as "suspicious." Bank of Palestine knew these allegations to be false.

96. On March 14, 2018, Bank of Palestine and Palestinian Intelligence authorities published or caused to be published another article through Watanserb, which contained numerous defamatory statements known by Bank of Palestine to be false.

a. The article states that Mr. Elsalameen is an agent of Israel.

b. The article implies that Mr. Elsalameen's finances are illegitimately obtained and calls for investigation into his finances.

c. The article characterizes Mr. Elsalameen as "Dahlan's man in Washington," it states "unequivocally" that the source of the information that Mr. Elsalameen publishes on his social media accounts is Mohammed

Dahlan, and it claims that Mr. Elsalameen is working under the "orders and plan" of Mohammed Dahlan. Mohammed Dahlan is an outspoken critic of Palestinian President Mahmoud Abbas.

97. Bank of Palestine and Palestinian Intelligence authorities published or caused to be published another undated article through Watan News Agency. This article contained numerous false and defamatory statements and gross invasions of Mr. Elsalameen's privacy.

a. The article implies that Mr. Elsalameen's wealth and citizenship status are both illegitimately acquired.

b. The article published a photograph of Mr. Elsalameen's home in Washington, D.C.

98. Bank of Palestine and Palestinian Intelligence caused a fourth article to be published through Al Akhbar on June 11, 2018. This article contained numerous defamatory statements known by Bank of Palestine to be false, and contained gross invasions of Mr. Elsalameen's privacy.

a. The article contains details of Mr. Elsalameen's lawsuit against Bank of Palestine (that is, this action) and implies that the allegations contained therein are false.

b. The article reiterates claims made in previous articles that Mr. Elsalameen's property transaction was undertaken for the benefit of Israel and that Mr. Elsalameen is an agent of Israel.

99. Bank of Palestine and Palestinian Intelligence authorities caused a fifth article to be published through Al Akhbar, on June 11, 2018. This article contained numerous defamatory

statements known by Bank of Palestine to be false, and contained gross invasions of Mr. Elsalameen's privacy.

a. The article alleges that Mr. Elsalameen has illegitimate and treasonous ties to Israel.

b. The article publishes the account number associated with the Al Serena account.

c. The article characterizes Mr. Elsalameen as an "informant" for the current UAE ambassador to the United States, Yusuf Al-Otaiba.

100. In sum, Bank of Palestine and Palestinian Intelligence officials colluded to advance their mutually beneficial and unlawful goals. Bank of Palestine sought to induce Mr. Elsalameen to pay a bribe for its own gain and thereby tarnish his reputation as a respected and outspoken critic of the current Palestinian government's corrupt and unlawful practices. Bank of Palestine and Palestinian Intelligence conspired to defame Mr. Elsalameen and invade his privacy in retaliation for, to curtail, and to undercut Mr. Elsalameen's public criticism of Palestinian President Mahmound Abbas, the Palestinian National Authority and its constituent organizations, and other powerful Palestinian individuals and institutions, through the Hezbollah-owned and operated Al Akhbar news outlet and other news outlets.

*Bank of Palestine's Defamation, Conspiracy, and Invasions of Privacy Have Caused Profound Harm to Mr. Elsalameen*

101. As a result of Bank of Palestine's (and its co-conspirators') false and defamatory statements and public disclosure of personal identity information, Mr. Elsalameen has experienced profound harm in the District of Columbia. He has received death threats. His family in Palestine has been attacked in terroristic fashion. His e-mail and social media accounts

have been hacked on multiple occasions. His career and reputation in the business world and in Palestinian political circles have been profoundly damaged.

102. The defamatory publications and disclosure of personal identity information have resulted in Mr. Elsalameen's de facto exile from Palestine, where he grew up, because he fears unlawful arrest, detention, bodily harm, and even execution or assassination.

103. As a result of Bank of Palestine's actions, on October 22, 2016, Mr. Elsalameen's family home in Hebron was attacked by terrorists with incendiary explosives and M-16 assault rifles while his mother and siblings were present in the home. In fear for their lives after this attack, Mr. Elsalameen's family members left their home behind and have relocated to Israel.

104. As one of Bank of Palestine's defamatory statements included Mr. Elsalameen's home address in Washington, D.C., his residence has been subject to surveillance.

105. As a result of Bank of Palestine's actions, Mr. Elsalameen lives in perpetual fear for his and his family's safety. To protect himself and his family, he obtained a concealed weapons permit in the District of Columbia, and he has relocated his family to North Carolina.

106. While attending a United Nations conference in New York in September 2016, Mr. Elsalameen was photographed, and his image was published on social media by Marouf Alrefai, a close political associate of the Abbas regime. The publication included a caption which provided Mr. Elsalameen's hotel name and room number and indicated that Mr. Elsalameen was with Jewish-American associates.

107. On June 18, 2018, Mr. Elsalameen was informed by a director of the World Economic Forum that Bank of Palestine representatives directly requested Mr. Elsalameen's removal as a forum member. As with the other actions described above, Bank of Palestine had

no legitimate, lawful reason to take this action. The World Economic Forum elected not to remove Mr. Elsalameen.

108. Bank of Palestine's conduct has also resulted in significant, foreseeable harm to Mr. Elsalameen's business reputation, contractual relations, and business expectancies.

109. As a result of Bank of Palestine's false and defamatory statements in the Al Akhbar articles and other media outlets, Mr. Elsalameen has been essentially black-listed in the business communities of Palestine and other Arab nations. This was the readily foreseeable consequence of Bank of Palestine's actions.

110. The sale of the Jerusalem Property has never come to fruition because of Bank of Palestine's defamation and unlawful seizure of Al Serena's funds and interference with Mr. Elsalameen's legal right to access the funds in the account. As a result, Mr. Elsalameen has suffered damages in the amount of the balance of his frozen bank account, and, as was readily foreseeable to Bank of Palestine, his business reputation in the Middle Eastern business community has been greatly tarnished, causing him significant financial loss.

**COUNT I**
**Defamation *Per Se***

111. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

112. Bank of Palestine made numerous false and defamatory statements regarding Mr. Elsalameen to Palestinian Intelligence, including that he was attempting to broker a property transaction that would result in transfer of the Jerusalem Property to Jewish Israeli settlers, that Mr. Elsalameen was an agent of Israel, that he was under the protection of Shin Bet, and that he was attempting to use Al Serena to engage in unlawful activities. Bank of Palestine made these statements on or around April 7, 2016 to the Palestinian Attorney General. Even if such

statements were subject to a qualified privilege, Bank of Palestine made the statements with actual malice, i.e., Bank of Palestine knew the statements were false based on its longstanding relationship with Mr. Elsalameen and its understanding of the transaction involving the Jerusalem Property. Bank of Palestine made the statements: (a) to retaliate against Mr. Elsalameen for refusing to pay Bank of Palestine a bribe and for publicly criticizing corrupt practices of the Abbas regime and Palestinian business institutions; and (b) to further its conspiracy with Palestinian Intelligence to defame Mr. Elsalameen by obtaining an order to freeze Al Serena's account.

113. Bank of Palestine made additional false and defamatory statements, without privilege, regarding Mr. Elsalameen through Al Akhbar, Al-Quds News Agency, Watanserb, and Watan News Agency from on or about May 27, 2016 to on or about June 11, 2018, as set forth in paragraphs 79–100, *supra*. Bank of Palestine caused these statements to be published publicly on the internet, where they were accessible worldwide and viewed in the District of Columbia. Bank of Palestine made the statements with actual malice, i.e., Bank of Palestine knew the statements were false based on its longstanding relationship with Mr. Elsalameen.

114. Bank of Palestine caused these statements to be published for the following corrupt purposes: to retaliate for Mr. Elsalameen's refusal to pay the bribe to the Bank; to defame, discredit, and otherwise damage Mr. Elsalameen in retaliation for his public criticism of President Abbas and the Palestinian National Authority and other powerful individuals and institutions in Palestine; to intimidate and coerce Mr. Elsalameen into ending his criticism of President Abbas and the Palestinian National Authority and other powerful individuals and entities in Palestine that Mr. Elsalameen believes are corrupt; and to curry favor with President Abbas and the Palestinian National Authoirty.

115. In addition to Bank of Palestine's original publication of the false and defamatory statements through Al Akhbar, Bank of Palestine is also liable for numerous foreseeable republications of the false and defamatory statements through Twitter accounts, Facebook posts, and other social media outlets controlled by Bank of Palestine's co-conspirators in Palestinian Intelligence.

116. The statement that Mr. Elsalameen intended to broker a property transaction that would result in the transfer of Palestinian-held real property to Jewish Israeli settlers is actionable as a matter of law because, if true, it would constitute treason under Palestinian law.

117. Mr. Elsalameen has also suffered significant special harm resulting from Bank of Palestine's defamatory statements. He has suffered harm to his reputation, lost business opportunities, and has also lost the opportunity to gain goodwill in the Middle Eastern business community by completing the acquisition of the Jerusalem Property.

118. Bank of Palestine's defamation of Mr. Elsalameen has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $5,980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT II**
**Conspiracy to Defame**

119. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

120. Bank of Palestine and members of Palestinian Intelligence entered into an agreement in early 2015, the purpose of which was to injure Mr. Elsalameen through the publication of defamatory statements. Bank of Palestine and its co-conspirators' agreement was

facilitated through the close relationships of senior Bank of Palestine officials and senior members of Palestinian Intelligence and the Palestinian National Authority.

121. Bank of Palestine entered into the conspiracy to defame Mr. Elsalameen for the following corrupt purposes: to retaliate for Mr. Elsalameen's refusal to pay the bribe to the Bank; to defame, discredit, and otherwise damage Mr. Elsalameen in retaliation for his public criticism of President Abbas and the Palestinian National Authority and other powerful individuals and institutions in Palestine; to intimidate and coerce Mr. Elsalameen into ending his criticism of President Abbas and the Palestinian National Authority and other powerful individuals and entities in Palestine that Mr. Elsalameen believes are corrupt; to curry favor with President Abbas and the Palestinian National Authority. Bank of Palestine's co-conspirators entered into the conspiracy to retaliate against Mr. Elsalameen for: his outspoken criticism of the corruption of the Palestinian National Authority and its President, Mahmood Abbas; and his refusal to discredit himself by engaging in similarly corrupt practices.

122. On information and belief, Bank of Palestine Chairman, Hashim Shawa, and Major General Majed Faraj, Director of Palestinian Intelligence agency Mukhabarat, met in person to form the conspiracy on behalf of their respective organizations.

123. Bank of Palestine and its co-conspirators intentionally and maliciously caused injury to Mr. Elsalameen by publishing or causing to be published false and defamatory statements about him to the Palestinian Attorney General and, through Al Akhbar, to the public at large, including in the District of Columbia. Bank of Palestine and its co-conspirators knew these statements to be false when making the publications in furtherance of their conspiracy to injure and discredit Mr. Elsalameen.

124. Bank of Palestine's conspiracy with Palestinian Intelligence to defame Mr. Elsalameen has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $5,980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT III**
**<u>Invasion of Privacy – Publicity Concerning the Private Life of Another</u>**

125. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

126. Bank of Palestine intentionally and without legal justification made public many confidential matters concerning the private life of Mr. Elsalameen. These included publishing unredacted copies of his Israeli identity card, his Israeli passport, and his United States passport. Bank of Palestine further published details of Mr. Elsalameen's and Al Serena's contemplated acquisition of the Jerusalem Property, and details of Mr. Elsalameen's and Al Serena's Bank of Palestine statements.

127. It is highly offensive to a reasonable person to have such personal identity information and information regarding private business transactions and accounts disclosed to any third party, in particular in public forums such as Al Akhbar, Al-Quds News Agency, Watanserb, and Watan News Agency.

128. The public had no legitimate concern warranting the disclosure of Mr. Elsalameen's personal identity information. Nor does the public have a legitimate concern warranting the disclosure of details of the entirely lawful Jerusalem Property transaction. Bank of Palestine caused this information to be publicized in an effort to discredit and punish

Mr. Elsalameen for his public criticisms of corruption and oppression by Palestinian President Mahmoud Abbas and the Palestinian National Authority.

129. The publicizing of this information put Mr. Elsalameen's physical safety at risk and severely damaged his employment and business opportunities in the District of Columbia.

130. Bank of Palestine's invasion of Mr. Elsalameen's privacy has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $5,980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

## COUNT IV
## Invasion of Privacy – False Light

131. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

132. Bank of Palestine gave significant publicity to confidential details of the Jerusalem Property transaction, but cast them in a false and deceptive light in order to give the appearance of disloyalty and illegality.

133. Bank of Palestine cast details of the Jerusalem Property transaction in a manner that would be highly offensive to the reasonable person, i.e., Bank of Palestine cast the information in such a way as to suggest that Mr. Elsalameen is an agent of the Israeli government, under the protection of Shin Bet, and a traitor to Palestine. These public characterizations put Mr. Elsalameen and his family at risk, caused severe harm to his emotional well-being, and damaged his reputation and business interests.

134. Bank of Palestine had actual knowledge of the true, lawful details regarding the Jerusalem Property transaction through its regular contacts with Mr. Elsalameen, his brother, and

his counsel. Bank of Palestine never made any effort to recant or refute its false and defamatory publications despite being fully aware of the truth.

135. Bank of Palestine's casting of Mr. Elsalameen in a false light has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $980,000.00. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT V**
**Tortious Interference with Contract**

136. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

137. Mr. Elsalameen had a valid contractual relationship with Lamiaa Gouda and her son and attorney-in-fact, Adeeb Jawad Gouda, for the purchase of the Jerusalem Property.

138. Bank of Palestine knew of the contractual relationship because Mr. Elsalameen provided Bank of Palestine a copy of the sales agreement and because Mr. Elsalameen had discussed the property transaction with senior Bank of Palestine officials on numerous occasions.

139. Through Bank of Palestine's conspiracy with Palestinian Intelligence to defame Mr. Elsalameen, Bank of Palestine's defamation of Mr. Elsalameen, and Bank of Palestine's refusal to release funds for the final tranche owed under the sales agreement from the Al Serena account—absent a $500,000 bribe from Mr. Elsalameen—Bank of Palestine caused a breach of the sales agreement.

140. Bank of Palestine's tortious interference with Mr. Elsalameen's contract to purchase the parcel of real property in Jerusalem has caused Mr. Elsalameen significant harm to his reputation and standing in the Palestinian and UAE business communities and damages in an

amount to be proven at trial, but no less than $980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous.

**COUNT VI**
**Fraud**

141. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

142. On March 18, 2016, Bank of Palestine, through the Head of the Diaspora Unit, Salim Hodali, falsely represented to Mr. Elsalameen that the Al Serena account was frozen because Bank of Palestine required additional documentation pertaining to his identity and his aunt's estate in order to establish who had authority over the account.

143. This misrepresentation was material. Whereas Bank of Palestine had previously indicated that the account was frozen for other reasons, it now represented that eliminating the freeze was merely a matter of administrative paperwork pertaining to Miriam Salameen's estate.

144. Bank of Palestine knew that the representation was false, because it never intended to release the funds in the Al Serena account, regardless of the documentation Mr. Elsalameen provided.

145. Bank of Palestine intended to deceive Mr. Elsalameen for the purpose of gathering highly sensitive personal identity information, such as pictures of Mr. Elsalameen's passports and Israeli identity card, which it would later use to defame him and invade his privacy.

146. Mr. Elsalameen relied on Bank of Palestine's March 18, 2016 misrepresentation. Had Mr. Elsalameen known Bank of Palestine's true intent in requesting the documentation, he never would have provided it to Bank of Palestine. Mr. Elsalameen, directly and through his

counsel, in reliance on Bank of Palestine's misrepresentation, in fact provided Bank of Palestine with copious, private and sensitive documentation concerning Mr. Elsalameen and the estate of his aunt.

147. Bank of Palestine's fraud against Mr. Elsalameen has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $5,980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT VII**
**Civil Conspiracy**

148. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

149. Bank of Palestine and members of Palestinian Intelligence entered into an agreement in early 2015, the purpose of which was to injure Mr. Elsalameen through multiple unlawful acts, including invasion of privacy, tortious interference with contract, tortious interference with business opportunity, solicitation of a bribe, and making false reports to Palestinian government officials, including the Palestinian Attorney General. Bank of Palestine and its co-conspirators' agreement was facilitated through the close relationships of senior Bank of Palestine officials and senior members of Palestinian Intelligence and the Palestinian National Authority.

150. Bank of Palestine entered into the conspiracy in retaliation for: (a) Mr. Elsalameen's outspoken criticism of the corruption within powerful Palestinian institutions; and (b) Mr. Elsalameen's refusal to pay Bank of Palestine a $500,000 bribe. Additionally, Bank of Palestine entered the conspiracy to curry political favor with the Abbas regime. Bank of

Palestine's co-conspirators entered into the conspiracy to retaliate against Mr. Elsalameen for: (a) his outspoken criticism of the corruption of the Palestinian National Authority and its President, Mahmood Abbas; and (b) his refusal to discredit himself by engaging in similarly corrupt practices with Bank of Palestine employees.

151. Bank of Palestine and its co-conspirators caused injury to Mr. Elsalameen by publishing false and defamatory statements about him to the Palestinian Attorney General and, through Al Akhbar, to the public at large, including in the District of Columbia, invading his privacy, and interfering with his business activities. Bank of Palestine and its co-conspirators undertook each of these actions in furtherance of their conspiracy to injure and discredit Mr. Elsalameen.

152. Bank of Palestine's conspiracy with Palestinian Intelligence has directly and proximately caused Mr. Elsalameen damages in an amount to be proven at trial, but no less than $5,980,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**

153. Plaintiff realleges and incorporates the allegations set forth above as if fully set forth herein.

154. Bank of Palestine disseminated false and malicious information about Mr. Elsalameen to Palestinian Intelligence, including that he was attempting to broker a property transaction that would result in transfer of the Jerusalem Property to Jewish Israeli settlers, that Mr. Elsalameen was an agent of Israel, that he was under the protection of Shin Bet, and that he was attempting to use Al Serena to engage in unlawful activities.

155. These publications included Mr. Elsalameen's home address in Washington, D.C., a photograph of his home, and other confidential information, including his passports and identification.

156. Bank of Palestine intentionally released this information in an effort to punish and silence Mr. Elsalameen by threatening his personal safety and the safety of his family, and severely damaging his reputation and career.

157. As a result of this release of information, Mr. Elsalameen has been followed and subject to surveillance and his mother and siblings have been attacked with lethal force in their home country.

158. These occurrences have caused Mr. Elsalameen severe mental suffering, as he lives in an unceasing state of fear for his own safety and the safety of his family. The stress and anxiety he suffers have caused him to obtain a concealed weapons permit and contributed to his decision to move his family to another state.

159. The emotional distress inflicted upon Mr. Elsalameen has directly and proximately resulted in damages in an amount to be proven at trial, but not less than $5,000,000. Mr. Elsalameen further seeks an award of punitive damages because Bank of Palestine acted with evil motive, actual malice, and with the intent to injure Mr. Elsalameen; and its conduct was outrageous and reckless toward his safety.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and a judgment against Defendant as follows:

A. entering judgment against Defendant and in favor of Plaintiff for each count alleged in this Complaint;

B. awarding Plaintiff compensatory damages in an amount to be determined at trial, but of no less than $5,980,000 plus pre- and post-judgment interest, special, punitive, and other allowable damages, as well as Plaintiff's reasonable attorneys' fees and costs;

C. retaining jurisdiction for the purpose of enabling Plaintiff to apply to the Court for such further orders and directions as may be necessary or appropriate for the construction or carrying out of any orders made in this action, for the modification of any such orders, for enforcement of compliance therewith and punishment of any violations thereof; and

D. awarding Plaintiff all other relief the Court deems just and proper.

Dated: June 28, 2018

Respectfully submitted,

**FADI ELSALAMEEN**

By: */s/ Scott D. Gilbert*

Scott D. Gilbert (D.C. Bar No. 290932)
Gilbert LLP
1100 New York Avenue NW, Suite 700
Washington, DC 20005
Telephone: (202) 772-2277
Facsimile: (202) 772-3333
E-mail: gilberts@gotofirm.com

*Counsel for Plaintiff Fadi Elsalameen*